1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAMON GUARDADO, JR., | CASE NO. 1:09-cv-01450-SMS |
|            Plaintiff, | |
|     v. | ORDER REVERSING AGENCY'S DENIAL OF BENEFITS, DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF, AND REMANDING FOR FURTHER PROCEEDINGS |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
|            Defendant. | |
| _____/ | |

Plaintiff Ramon Guardado, Jr., by his attorney, Ann M. Cerney, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits (DIB) under Title II of the Social Security Act and for supplemental security income  ("SSI"), pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act").  The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1]  Following a review of the complete record and applicable law, this Court finds that the decision of the Administrative Law Judge ("ALJ") disregarded substantial portions of the agency record and failed to set forth his findings and analysis in sufficient detail.  As a result, this Court reverses the decision below and remands for further proceedings.

///

---

[1]  Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 12 & 25).

# I.   Administrative Record

## A.   Procedural History

On March 16, 2007, Plaintiff applied for disability benefits pursuant to Title II of the Social Security Act and for supplemental security income ("SSI"),  alleging disability beginning March 30, 2005.  His claims were initially denied on September 27, 2007, and upon reconsideration, on January 11, 2008.  On January 18, 2007, Plaintiff filed a timely request for a hearing.  Plaintiff appeared and testified at a hearing on July 2, 2008.  On December 24, 2008, Administrative Law Judge James M. Mitchell denied Plaintiff's application.  The Appeals Council denied review on July 2, 2009.  On August 18, 2009, Plaintiff filed a complaint seeking this Court's review.

## B.   Factual Record

Plaintiff (born September 18, 1958) worked as a forklift operator for many years, first, at a food processing plant and later, for a lumber and millwork company.  He loved his job and testified that he wanted to return to it.  Plaintiff reported that he was released from his last job because of his illnesses and chronic fatigue.  Plaintiff attended school through the tenth grade, and did not graduate or complete a GED.

Plaintiff was five feet, four inches, with weight ranging from 210 to 254 pounds during the course of processing his application.  In a disability report dated April 24, 2008, he reported that his medications included Aciphex, Actos, Buspirone, Glipizide, Lisiopril, Metformin, ProVigil, Sertraline, and Temazepam.[2]

---

[2]  Aciphex (rabeprazole) is prescribed to treat symptoms of gastroesophageal reflux disease (GERD), a condition in which backward flow of stomach acid into the esophagus causes heartburn and possible injury of the esophagus.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001068 (May 4, 2011).

Actos (pioglitazone) is prescribed with diet and exercise to treat type II diabetes. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001047 (May 4, 2011).

Buspirone is used for short-term treatment of anxiety.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000876 (May 4, 2011).

Glipizide is prescribed with diet and exercise to treat type II diabetes. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000834 (May 4, 2011).

Lisinopril is used alone or with other medications to treat high blood pressure.

**Treatment records (Paul McGrew, M.D.).**  The earliest record of Plaintiff's illness is his appointment with Paul McGrew, M.D. on April 6, 2005.  Plaintiff complained of stress and of feeling down, sad, and irritable for about a month.  Plaintiff was sleeping OK but was missing one or two days of work each week because of fatigue.  He felt anxious.  In addition to Plaintiff's existing non-insulin dependent diabetes, McGrew diagnosed depression and prescribed Lexapro.

By his appointment with McGrew on April 27, 2005, Plaintiff felt a little better.  He had been out on disability since April 6 but was still sometimes agitated.  He was crying less and was less irritable.  McGrew assessed Plaintiff as having appropriate mood and affect and noted no side effects from the medications.  He referred Plaintiff to a counselor.

On June 16, 2005, Plaintiff's blood sugars were high (218 the prior day), and he was experiencing back and abdominal pain with mild nausea and diarrhea.  Plaintiff complained of being sleepy.  Noting tenderness in the periumbilical region, McGrew diagnosed infectious gastroenteritis in addition to diabetes and depression.

By his August 25, 2005 examination, Plaintiff's medications had changed to Zoloft and Busporone.  He complained that he was sometimes too sleepy to work; he had returned home from work that day because of severe fatigue.  Plaintiff reported loud snoring and occasional apnea.  His blood glucose was 200.  McGrew referred Plaintiff for a sleep study.

Plaintiff's main complaint on December 28, 2005, was back pain despite having experienced no injury.  McGrew diagnosed lumbrosacral strain.

---

www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000917 (May 4, 2011).

Metformin is used with other medications, including insulin, to treat type II diabetes. Fortamet is a brand of metformin.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000974 (May 4, 2011).

ProVigil (modafinil) is used to treat excessive sleepiness caused by narcolepsy, shift work sleep disorder, or, along with breathing devices and other medications, to treat excessive sleepiness cause by obstructive sleep apnes/hypopnea syndrome (OSAHS).  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000196 (May 4, 2011).

Sertraline is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder.  Zoloft is a commonly known brand.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001017 (May 4, 2011).

Temazepam is a benzodiazepam used on a short-term basis to treat insomnia.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000808 (May 4, 2011).

1    On March 6, 2006, Plaintiff reported problems with his CPAP mask, which made his
2  mouth get dry.  He was tired all the time and had been in bed since last Monday.  Plaintiff
3  requested a visit with the psychologist and a month off of work.

4    On March 20, 2006, Plaintiff was off work.  He still needed a new CPAP mask.  McGrew
5  added a diagnosis of hyperlipidemia and prescribed Lovastatin.  In relation to his diagnosis of
6  diabetes, McGrew noted that Plaintiff needed to lose weight.

7    By August 7, 2006, Plaintiff, who had begun taking ProVigil each morning, complained of
8  being severely tired and unable to get out of bed.  He had a new CPAP mask but was still unable
9  to keep it on through the night; he requested a full face mask.  Despite taking Temazepam,
10  Plaintiff was waking every two hours and did not sleep well.  Plaintiff's anxiety was improved,
11  however, and he was staying awake from 10:00 a.m. until he went to sleep at 11:00 p.m.

12    On May 21, 2007, McGrew noted that Plaintiff, who had not worked in over a year, had
13  been fired.  His glucose was high: McGrew noted "very poor control."   Plaintiff also had a dental
14  infection.  McGrew noted that Plaintiff's judgment was appropriate, and he was oriented and had
15  normal memory and appropriate mood and affect.

16    **Psychologist's notes**.  Beginning on May 2, 2005, Plaintiff's treating psychologist,
17  Tamara Elkins, Ph.D., provided periodic reports to McGrew.  Elkins' objectives were to assist
18  Plaintiff in developing stress management skills using cognitive and relaxation therapies.

19    On June 13, 2005, Elkins reported that Plaintiff was complaining of constant fatigue and
20  would go sleep on the couch on the days his wife forced him to get out of bed.  Elkins questioned
21  whether a more stimulating antidepressant might be substituted for the Lexapro that Plaintiff was
22  then taking, since Lexapro might have a sedating effect.

23    On July 28, 2005, Elkins wrote that, although she had been prepared to send Plaintiff back
24  to work, he had suffered a setback and frequent panic attacks, which could have been attributable
25  either to stress associated with Plaintiff's planned appointment to meet with his boss to discuss his
26  return to work or Plaintiff's father's sudden serious illness and surgery.  Plaintiff's wife told
27  Elkins that Plaintiff could not cope with the least stress, retreating into sleep when he felt
28  overwhelmed.  Elkins suggested to McGrew that Plaintiff might benefit from an anti-anxiety drug,

although she discouraged a benzodiazepine since Plaintiff was to return to work operating heavy machinery.

Plaintiff's anxiety also increased in March 2007.  He told Elkins that the Buspar was no longer helping him manage anxiety.  Elkins also addressed Plaintiff's difficulty in securing his ProVigil prescription since his insurance carrier denied coverage for it.  In April 2007, Elkins suggested a trial period of ProVigil to determine the propriety of the prescription before filing an appeal with Plaintiff's insurer.  Plaintiff was also trying a new CPAP mask in April 2007.  Finally, Elkins reported that Plaintiff's blood sugar readings were consistently high and that he had stopped using a cholesterol medication that was making him ill.

In May 2007, Elkins again asked McGrew to secure ProVigil samples for a trial period, reporting that because Plaintiff was experiencing severe sleep dysfunction, he complained of lack of motivation, low energy, and a constant desire to sleep.  Plaintiff was removing his CPAP mask every few hours during the night, sometimes without being aware of his action.  Elkins reported that if Plaintiff was unable to return to work within the next few weeks, he was going to be fired.

By June 2007, Plaintiff's sleep habits and exhaustion were improving on the trial course of ProVigil.

On December 28, 2007, Plaintiff told Elkins that he felt degraded.  He could not afford the co-pay to see his doctor, had sent his son to apply for food stamps, and had been turned away from the foodbank.  He described himself as depressed and unmotivated.  His wife told Elkins that Plaintiff was now falling asleep suddenly, sometimes in the middle of a conversation.  Elkins characterized Plaintiff as having descended into a "vicious cycle of depression & ill health that are feeding on each other and destroying [Plaintiff's] ability to function."  AR 220.

**Sleep Study (October 8, 2005).**  Avi Ishaaya, M.D., supervised an overnight sleep study of Plaintiff on October 8, 2005.  Analysis on Plaintiff's sleep revealed moderate sleep apnea, severe sleep related oxygen desaturations, severe SaO2 nadir, moderate respiratory related sleep fragmentation (37 respiratory arousals per hour), severe snoring, and ECG/EKG abnormalities. Ishaaya noted that Plaintiff experienced reduced deep sleep and no REM sleep.  Treatment options included initiation of nasal CPAP, uvulapalatoplasty or glossoplasty, or use of a dental appliance.

1   If clinically indicated, other recommendations would include weight loss, thyroid function testing,

2   and avoiding sedatives and alcohol.

3       **Adult Function Report (March 25, 2007).**[3]  Plaintiff described a daily routine in which

4   he steadily slept for a few hours, awoke to eat, then slept a few hours more before again waking

5   and eating.  On some days, he was able to wake, eat breakfast, and stay up for three or four hours

6   before he was so exhausted that he needed to return to bed.  He could no longer concentrate or

7   sleep and wake in a regular daily pattern.  Plaintiff never felt that he had enough sleep.

8       Although Plaintiff thought he got along well with others, being around others gave him

9   anxiety attacks.  He could not handle stress.  He had problems with memory, concentration, and

10  following instructions. He had difficulty hearing.

11      Although he had household chores, motivating him to do them was difficult.  His wife

12  handled the housework and family finances.

13      Plaintiff enjoyed going to Home Depot once a week and looking at the tools.  Other than

14  that outing, he didn't "like to do much of anything anymore," including the things he used to

15  enjoy, such as sports, television, and going out.  Sometimes he forgot to go to doctors'

16  appointments or to take medication.

17      **Third-party Disability Report (March 25, 2007).**  Plaintiff's sister, Rosa Guizar, visited

18  Plaintiff four or five days a week.  She reported that he got up only to go back to sleep on the

19  couch in front of the television.  "If we let him," said Guizar, "he doesn't get out of bed."  AR 88.

20  He no longer dressed himself and neglected personal care such as cutting his hair or shaving.  He

21  was having trouble hearing.

22      Although Plaintiff was supposed to be responsible for the yard work, he worked only five

23  or ten minutes before wandering away.  Sometimes Guizar was able to get him to go outside with

24  her to help weed the flowers.  She took him to Home Depot about once a week just to get him out

25  of the house.

26  ///

27

28

[3] Plaintiff's wife completed the form on his behalf.

Guizar reported that, although Plaintiff had once been very active, he was now always exhausted.  He had lost interest in sports and going out.  He had begun to spend money thoughtlessly, without thinking of necessities.

**Psychological Disability Evaluation (May 17, 2007).**  Deborah von Bolschwing, Ph.D., examined Plaintiff on behalf of the agency on May 17, 2007.  Her report was countersigned by her supervisor, Roxanne Morse, Ph.D.  von Bolschwing observed Plaintiff to be appropriately dressed with adequate hygiene.  He was alert and fully oriented; his speech was clear and coherent; his thought process was linear; his thought content was logical.  Although mildly depressed, Plaintiff's insight and judgment appeared to be intact, and he reported no homicidal or suicidal ideation.  von Bolschwing noted that Plaintiff had hearing difficulties since childhood but had never worn a hearing aid.

Plaintiff was cooperative and demonstrated adequate effort in the testing process, but his concentration and attention wavered.  His memory was intact.  He could read and complete the history form.  He could write a simple sentence.  He had mild difficulty doing arithmetic in his head, but demonstrated common sense and abstract reasoning.  He worked slowly but with adequate persistence.

Plaintiff's intelligence testing scores fell in the low average range, with weakness in academic functioning.  His score on the Bender-Gestalt Test II, which assesses visuo-constructive ability, was in the average range.  Plaintiff's M-FAST scores suggested genuine and forthright presentation of symptoms.  von Bolschwing diagnosed Plaintiff:

| | |
|---|---|
| Axis I | Dysthymia |
| Axis II: | No Diagnosis |
| | Intellectual Functioning Within the Borderline Impaired to Low Average Range |
| Axis III: | Deferred to Medical Opinion |

AR 109.

von Bolschwing opined that Plaintiff had no impairment in his ability to follow or remember simple instructions; to follow or remember complex or detailed instructions; to maintain adequate pace or persistence to perform one or two step simple repetitive tasks; to

maintain emotional stability or predictability; to interact appropriately with co-workers and supervisors on a regular basis; to interact appropriately with the public on a regular basis; to communicate effectively with others (verbal); and to communicate effectively with others (written).  He had no to mild impairment in his ability to adapt to changes in job routine.  Plaintiff had mild impairment in his ability to maintain adequate pace or persistence to perform complex tasks; to maintain adequate attention or concentration; to withstand the stress of a routine work day; and to perform tasks requiring mathematical skills.  Plaintiff appeared cognitively able to manage his funds.  von Bolschwing recommended that Plaintiff's ability to work be re-evaluated in six months.

**Emergency Room Treatment (May 18, 2007).**  On May 18, 2007, Plaintiff was treated in the emergency room of Doctors Medical Center for elevated blood sugar (510) and elevated hemoglobin alcohol.

**Internal Medicine Evaluation (May 23, 2007).** Family practitioner Miguel Hernandez, M.D., who examined Plaintiff on behalf of the agency, diagnosed obstructive sleep apnea, stress, anxiety and panic attacks, diabetes mellitus, and glaucoma.  He opined that Plaintiff could stand and walk about six hours in an eight-hour workday, could sit about six hours in an eight-hour workday, could lift and carry twenty pounds occasionally, and ten pounds frequently.  Plaintiff had no postural or manipulative limitations.  Because of his vision and glaucoma, Plaintiff should avoid dimly lit and dark rooms and spaces.

**Disability Report-Appeal (January 18, 2008).**  Plaintiff's sister, Nancy Guardado, reported that Plaintiff's physical condition had worsened since his diabetes caused nerve damage to his feet and legs.  The bottoms of Plaintiff's feet burned, and he could not stand for more than ten minutes at a time.  He had stopped interacting with others, including his children and grandchildren.  His ability to think and communicate had worsened.  He could not drive because he blacked out.  Plaintiff frequently lost bowel control, and could frequently be found crying in

///

///

///

the dark.  Plaintiff's medications included Aciphex, Actos, Alprazolam, Effexor, Fluoxetine, Januvia, Lisinopril, Lyrica, Metformin, Metropolol, Nortripyline, ProVigil, and Zolpidem.[4]

**Psychiatric Review Technique (September 25, 2007).**  Agency psychiatrist Archimedes Garcia, M.D., determined that Plaintiff had an affective disorder that did not result in a severe impairment.  Garcia determined that Plaintiff's alleged depression and anxiety did not satisfy the regulatory criteria of Section 12.04 and that Plaintiff had no restrictions of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, and pace, and no repeated episodes of decompensation, each of extended duration.

**Doctor's notes (Priti Modi, M.D.).**[5]  Plaintiff first saw Modi on August 26, 2007.  Plaintiff's blood sugars were high, and he was gaining weight.  He complained of headaches and leg pain, stating that his legs got cold and twitched during the night.  He had sleep apnea and used a CPAP machine at night; by day, he was sleepy and used ProVigil.  Plaintiff was seeing a psychiatrist for anxiety and depression.  He claimed he was totally disabled and seeking SSI.  Modi advised Plaintiff to begin using insulin and to begin testing his blood sugar three times

---

[4]  Aprazolam is a benzodiazepam prescribed to treat anxiety disorders and disorder.  Common brands include Niravam and Xanax.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000807 (May 4, 2011).

Effexor (venlafaxine) is used to treat depression.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000947 (May 4, 2011).

Fluoxetine is prescribed to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks.  Prozac is a commonly known brand.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000885 (May 4, 2011).

Januvia (sitagliptin) is used along with diet and exercise to lower blood sugar levels in patients with type II diabetes.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000350 (May 4, 2011).

Lyrica (pregabalin) is used to treat neuropathic pain (pain from damaged nerves).  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000327 (May 4, 2011).

Metropolol is used alone or in combination with other medications to treat high blood pressure.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000795 (May 4, 2011).

Nortriptyline is used to treat depression.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000732 (May 4, 2011).

Zolpidem is used to treat insomnia.  Ambien is a commonly known brand.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000928 (May 4, 2011).

[5]  Portions of Modi's treatment records, which are untranscribed, are indescipherable.

1  daily.  Modi diagnosed Plaintiff with poorly controlled non-insulin dependent diabetes,

2  hypertension, obstructive sleep apnea, diabetic neuropathy, GERD/dyspepsia, obesity,

3  drowsiness/fatigue, and insomnia.

4       Modi again advised Plaintiff to start using insulin at an October 26, 2007 appointment.

5       In notes from the November 16, 2007 appointment, Modi noted that Plaintiff had run out

6  of some medicines, including insulin and other diabetes medications, due to lack of money.  His

7  blood sugars were very high.

8       On June 9, 2008, Plaintiff complained of pain in his legs and feet.  His blood sugars were

9  elevated.  On June 13, 2008, Plaintiff's sugars were again elevated (300-400).

10      **Multiple Impairment Questionnaire (June 19, 2008).**  Modi completed a ten-page

11  questionnaire, apparently provided by Plaintiff's counsel.  Plaintiff's diagnoses included

12  uncontrolled Diabetes type II with diabetic peripheral neuropathy, hypertension, hyperlipidemia,

13  obstructive sleep apnea, anxiety, depression, hypothyroidism, back pain, chronic pain syndrome,

14  and arthritis.  In light of his poor response to nearly all antidepressants and diabetic medications,

15  Plaintiff's prognosis was guarded.  Modi reported that Plaintiff experienced chronic back pain

16  rated 9 on a scale of ten, and fatigue rated nine on a scale of ten.  His uncontrolled diabetes

17  rendered him susceptible to infections.

18       Modi opined that Plaintiff could sit for two hours in an eight-hour work day, and could

19  stand or walk one hour in an eight-hour workday.  He could not sit continuously but needed to

20  move once each hour for five to ten minutes.  He could not stand or walk continuously.  Plaintiff

21  could occasionally lift or carry up to twenty pounds.  Because of arthritis pain in his hands and

22  shoulders and carpal tunnel syndrome, he was significantly limited in reaching, handling,

23  fingering, and lifting. Both of Plaintiff's hands were moderately limited in grasping, turning, and

24  twisting objects and markedly limited in fine manipulations and reaching.  Plaintiff required ready

25  access to a rest room.  He was also affected by limited vision, psychological limitations, and need

26  to avoid temperature extremes.  He could do no pushing, pulling, kneeling, bending, or stooping.

27  Plaintiff's symptoms constantly affected his attention and concentration.  They were likely to

28  ///

increase in a competitive work environment.  Modi opined that Plaintiff could not do a full-time competitive job that required activity on a sustained basis.

Plaintiff was incapable of tolerating even low stress work.  His emotions contributed to his symptoms and functional limitations.  Those included depression, sleep apnea, and lack of initiative, concentration, judgment, power, problem solving and interpersonal relations.

Plaintiff would require at least four unscheduled breaks of at least ten minutes daily.  He would be absent from work more than three times each month.

**Psychiatric/Psychological Impairment Questionnaire (June 19, 2008).**  Modi also completed a questionnaire addressing psychological symptoms.  Modi diagnosed Plaintiff:

| | |
|---|---|
| Axis I | Depression |
| Axis II: | Depressive personality |
| Axis III: | [non-insulin dependent diabetes mellitus], type 2 poorly controlled, obstructive sleep apnea, chronic pain, |
| Axis IV: | unemployment, chronic pain |
| Axis V: | poor current level of functioning (2 on a scale of 1-10) |

Highest GAF past year        low level of functioning (4 on scale of 1-10).

AR 231.[6]

Modi opined that Plaintiff's prognosis was guarded, dependant on whether his physical illnesses improved.  She checked off the following clinical findings as supporting her diagnosis: poor memory, appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, emotional lability, loss of intellectual ability of 15 IQ points or more, recurrent panic attacks, anhedonia or pervasive loss of interests, psychomotor agitation or retardation,

---

[6]   The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of the diagnosis.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR").  It considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in functioning due to physical (or environmental) limitations." *Id*. at 34.  The first description in the range indicates symptom severity; the second, level of functioning.  *Id*. at 32.  In the case of discordant symptom and functioning scores, the final GAF rating always reflects the worse of the ratings.  *Id*. at 33.

Modi's GAF scores do not follow the system prescribed by the American Psychiatric Association, which uses a scale of 1-100.

feelings of guilt/worthlessness, difficulty thinking or concentrating, oddities of thought, perception, speech or behavior; social withdrawal or isolation, blunt, flat or inappropriate affect, decreased energy, persistent irrational fears, generalized persistent anxiety, somatization unexplained by organic disturbance, hostility and irritability, and pathological dependence or passivity.  The diagnosis was further supported by the positive sleep study, elevated blood sugars, elevated TSH and lipids, elevated blood pressure, and fatigue.

Modi opined that Plaintiff was not limited in the ability to understand and remember one- or two-step instructions; to carry out simple one- or two-step instructions; or to be aware of normal hazards and take appropriate precautions.  Plaintiff was mildly limited in his ability to remember locations and work-like procedures; to sustain ordinary routine without supervision; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to ask simple questions or request assistance; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to respond appropriately to changes in the work setting.  Plaintiff was moderately limited in his ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule; maintain regular attendance and be punctual within customary tolerance; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to travel to unfamiliar places or use public transportation; and to set realistic goals and make plans independently.  Plaintiff was markedly limited in his ability to complete a workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest breaks.  Plaintiff could not tolerate even low stress.

Modi expected Plaintiff's impairments to last in excess of twelve months.  His depression exacerbated his pain and other physical symptoms.

///

///

///

12

**Medications list (June 20, 2008).**  Plaintiff's medications included Levothyroxine, Effexor, Cymbalta, Metoprolol, Antra, Fortamet, Levaquin, and Byetta exenatide injection.[7]

**Interview (April 24, 2008).**  In a face-to-face interview with Plaintiff, interviewer S. Johnson noted that Plaintiff had difficulty understanding and answering.  Johnson noted that, although Plaintiff was casually and adequately groomed, he had remnants of paint on his hands and arms, suggestive of his having recently done some handy work.

**Plaintiff's testimony (July 2, 2008).**  Plaintiff previously worked as a fork lift operator in a millwork company and in a frozen turkey processing plant.  Plaintiff typically woke at 6:00 a.m. and went to bed at 6:00 p.m., but often slept around the clock.  He estimated that he slept twenty hours daily.  His wife worked to support the family.  Plaintiff was able to prepare simple meals, such a sandwiches or microwaveable meals, and to clean up after himself.  He did not do the housework.  He spent about an hour a day reading and an hour watching television.  Shopping was very difficult although he would do it for his wife if she needed him to.  He made his bed about three times per month.

**Vocational Expert Testimony** (July 2, 2008).  Vocational expert George Meyers testified that Plaintiff's previous work as a forklift driver (semi-skilled) and warehouse worker (unskilled)

---

[7]  Levothyroxine, a thyroid hormone, is used to treat hypothyroidism, a condition in which the thyroid gland does not produce enough thyroid hormone, Without this hormone, the body cannot function properly, resulting in poor growth, slow speech, lack of energy, weight gain, hair loss, dry, thick skin, and sensitivity to the cold. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000684 (May 4, 2011).

Cymbalta (duloxetine) is used to treat depression, generalized anxiety disorder and the pain and tingling caused by diabetic neuropathy. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000274 (May 4, 2011).

Antra (omeprazole) is a proton pump inhibitor used for diseases that relate to excess stomach acid.  Prilosec is a commonly known brand name.  www.patienthealthinternational.com/content/product/antrol (May 4, 2011).

Levaquin (levofoxacin injection) is used to treat infections such as pneumonia, chronic bronchitis, and sinus, urinary tract, kidney, prostate, and skin infections.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000129 (May 4, 2011).

Byetta (exenatide) is used in combination with metformin, a sulfonylurea, or a thiazolinedione medication to treat type II diabetes.  It works to stimulate the pancreas to secrete insulin when blood sugar levels are high.  On August 18, 2008, the FDA issued a warning regarding cases of hemorrhagic and necrotizing pancreatis in some patients who used Byetta.  On November 2, 2009, the FDA warned physicians concerning reports of altered kidney function, including acute renal failure and insufficiency, in some patients who used Byetta. www.nlm.nih.gov/medlineplus/druginfo/meds/a605034.html (May 4, 2011).

was performed as heavy work.  The skills would not be transferable into the category of medium exertion.

For the first hypothetical question, the ALJ directed Meyers to assume a medium residual functional capacity and an individual forty-nine years old with limited education and Plaintiff's work history, who could lift, push and pull twenty-five pounds frequently and fifty pounds occasionally; could walk, stand, stoop, and bend frequently; and sit occasionally.  Meyers opined that such a person could not perform Plaintiff's previous work.  The hypothetical individual could perform the work of industrial cleaner (DOT No. 381.687-018, medium, unskilled, SVP:2), with 170,000 jobs in California; hand packager (DOT No. 920.587-018, medium, unskilled, SVP:2) with 12,000 jobs in California; or kitchen helper (DOT No. 318.687-010, medium, unskilled, SVP:2) with 13,000 jobs in California.

For the second hypothetical question, the ALJ asked Meyers the degree of erosion in the jobs listed in the first question if the hypothetical individual is unlimited in attention, concentration, understanding, and memory; has diminished vision and hearing, both of which are correctable; has intact and unlimited reach and fine and gross manipulative abilities; slight limitation in ability to do simple repetitive tasks; no environmental restrictions; unlimited public contact; occasional supervision; and slight to moderate pain.  Meyers opined the job totals would be eroded by ten percent.

For hypothetical question 2A, the ALJ added that the individual was slightly limited in attention, concentration, understanding and memory.  Meyers responded that erosion of available jobs would be twenty percent.

For hypothetical question 2B, the ALJ specified that the hypothetical individual would have moderate to severe pain but was only slightly limited in ability to do simple repetitive tasks.  Meyers responded that the available jobs would be reduced by fifty per cent.

For hypothetical question 2C, the ALJ specified that the hypothetical individual's ability to do simple repetitive tasks was moderately limited.  Meyers responded that no jobs would them be available.

///

14

For hypothetical question 3, the ALJ specified a light residual functional capacity.  The hypothetical individual was 49 years old, limited education, Plaintiff's work history, and could lift, push and pull twenty pounds occasionally and ten pounds frequently; walk and stand frequently; sit, stoop or bend occasionally.  Meyers opined that such a person could not perform Plaintiff's previous work.  He could work as an assembler of small products (DOT No. 706.684-022, light, unskilled, SVP:2) with 51,000 jobs in California; housekeeper (DOT No. 323.687-014, light, unskilled, SVP:2) with 16,000 jobs in California; or bottle line attendant (DOT No. 920.687-042, light, unskilled, SVP:1) with 5000 jobs in California.

For hypothetical question 4, the ALJ added that the individual was unlimited in attention, concentration, understanding and memory; diminished but correctable vision and hearing; reach and fine and gross manipulative abilities intact and unlimited; slight limitation in ability to do simple repetitive tasks; no environmental; restrictions; unlimited contact with the public; occasional supervision; [pain] slight to moderate.  Meyers replied that these additional impairments would reduce the number of jobs available by ten percent.

For hypothetical question 4A, the ALJ added that the individual was slightly limited in attention, concentration, understanding and memory.  Meyers responded that erosion of available jobs would be twenty percent.

For hypothetical question 4B, the ALJ specified that the hypothetical individual would have moderate to severe pain but was only slightly limited in ability to do simple repetitive tasks. Meyers responded that the available jobs would be reduced by forty per cent.

For hypothetical question 4C, the ALJ specified that the hypothetical individual's ability to do SRT was moderately limited.  Meyers responded that no jobs would them be available.

Finally, Plaintiff's attorney directed Meyers to assume an individual limited to light work with moderate limitation in the ability to maintain attention and concentration for extended periods; moderate limitation in the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; moderately limited in interaction with general public; moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors; moderately limited in his ability to travel to unfamiliar places or use

public transportation; and moderate able to set realistic goals or make plans independently.

Meyers opined that no jobs would be available for such a person.

## II.   <u>Legal Standards</u>

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since March 30, 2005.  He had multiple severe impairments: depression, glaucoma, sleep apnea, and a history of diabetes mellitus.  His impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  He was unable to perform his past

1    work.  Plaintiff had the residual functional ability to lift and carry 20 pounds occasionally and 10

2    pounds frequently, to stand/walk six hours in an eight-hour work day; and to sit six hours in an

3    eight-hour workday.  He was limited to simple, repetitive tasks with occasional supervision.

4    Plaintiff's diminished hearing and vision were correctable.  The ALJ concluded that Plaintiff was

5    not disabled.

6    **III.    Scope of Review**

7         Congress has provided a limited scope of judicial review of the Commissioner's decision

8    to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

9    a court must determine whether substantial evidence supports the Commissioner's decision.  42

10   U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*,

11   402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d

12   1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept

13   as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must

14   be considered, weighing both the evidence that supports and the evidence that detracts from the

15   Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

16   evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.,*

17   *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's

18   determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if

19   the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and*

20   *Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

21        The scope of review requires this Court to consider the record as a whole, examining both

22   the evidence supporting the ALJ's decision and the evidence that does not.  When it did so, the

23   Court discovered a record more extensive than the documents on which the ALJ had relied, which

24   portrayed the claimant very differently than the ALJ did.  When considered in light of applicable

25   law, the Court concludes that the ALJ erred in denying Plaintiff benefits.

26   ///

27   ///

28   ///

## IV.   **Discussion**

### A.   **Rejection of Plaintiff's Testimony, Treating Physician's Opinions, and Lay Opinions**

"[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).   He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007). *See also Robbins v. Social Security Admin.*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

The agency's perfunctory rejection of the testimony and opinions of Plaintiff, Dr. Modi, and Plaintiff's family members is the key issue in the Court's determination to remand this claim for further proceedings.   Examined as a whole, the record depicts Plaintiff as an individual who after a lifetime of hard work suddenly and unexpectedly became ill and apparently unable to cope with the demands of day-to-day life.   As the agency recognized, Plaintiff had multiple serious impairments, including depression, glaucoma, sleep apnea, and diabetes mellitus, which he contended had rendered him unable to stay awake, much less to work through an eight-hour work day.   The ALJ picked and chose evidence supporting the rejection of Plaintiff's claim and disregarded any contrary evidence.   By dodging or dismissing large portions of the agency record, the hearing decision managed never to confront, much less fairly resolve, the question of Plaintiff's extraordinary fatigue and sleepiness, and his sudden change in behavior.

Affirming the ALJ's decision would require this court to isolate and consider the limited portions of the record on which the ALJ chose to rely.   The Court may not do so. *See Lingenfelter v. Astrue*, 504 F.3d 1028. 1035 (9th Cir. 2007).   When an ALJ does not provide clear and convincing reasons for rejecting all or part of the record, the decision cannot be said to have been supported by substantial evidence. *Id.*   Reversal is required when an ALJ "develop[s] his

///

18

1 evidentiary basis by not fully accounting for the context of the materials or all parts of the

2 testimony and reports." *Reddick v. Chater*, 157 F.3d 715, 723 (9th Cir. 1998).

### 1.   Disregard of Lay Opinions

4 Plaintiff contends that the ALJ erred in rejecting Rosa Guizar's[8] opinion for unacceptable

5 reasons and by ignoring the lay opinions of Plaintiff's other relatives.  The Commissioner

6 responds that the error, if any, was harmless.  The Court agrees with Plaintiff that the

7 Commissioner erred in failing to consider the relatives' reports of sudden and dramatic changes in

8 Plaintiff, including chronic sleepiness and fatigue; loss of interest in nearly all aspects of life,

9 including activities that Plaintiff formerly enjoyed; and sudden withdrawal from family members

10 and friends.

11 The ALJ specifically addressed only the third-party disability report prepared by Guizar,

12 who was Plaintiff's sister.  He rejected Guizar's opinion as inconsistent with the medical

13 evidence:

> Ms. Rosa Guizar's report does not establish that the claimant is disabled.  Since
> she is not medically trained to make exacting observations as to dates, frequencies,
> types and degrees of medical signs and symptoms, or the intensity of unusual
> moods or mannerisms, the accuracy of her report is questionable.  Moreover, by
> virtue of the relationship as the claimant's sister, Ms. Guizar cannot be considered
> a disinterested third party witness whose report would not tend to be colored by
> affection for the claimant and a natural tendency to agree with the symptoms and
> limitations he alleges.  Most importantly, significant weight cannot be given to Ms.
> Guizar's report because it, like the claimant's reports and testimony, are simply not
> consistent with the preponderance of the opinions and observations by the medical
> doctors in this case.

20 AR 18 (*citations to hearing exhibits omitted*).

21 The ALJ completely disregarded the third-party opinions of Plaintiff's wife Rosa

22 Guardado, who completed Plaintiff's adult disability report on his behalf; Plaintiff's sister, Nancy

23 Guardado, whose later third-party disability report addressed Plaintiff's diabetic neuropathy,

24 depression, and lack of social interaction with family and friends; and letters from Plaintiff's

25 cousin, Carlos [last name illegible], and sister-in-law, Delia Moreno.

26

---

27     [8] Plaintiff erroneously states that the ALJ considered only the opinion of Rosa *Guardado*, Plaintiff's wife,
who prepared and signed Plaintiff's disability report on his behalf.  The ALJ addressed the opinion of Rosa *Guizar*,
28 Plaintiff's sister, who prepared the third-party adult disability report.

The ALJ clearly erred.  "Lay testimony as to a claimant's *symptoms* is competent evidence which the Secretary must take into account, unless he ultimately determines to disregard such testimony, in which case 'he must give reasons that are germane to each witness.'"  *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996), *quoting Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).  Friends and family members who are in a position to observe the claimant's symptoms and daily activities are competent to testify about their observations of the claimant's condition.  *Dodrill*, 12 F.3d at 918-19.  An ALJ's disregard of the testimony of friends and family members violates the regulations, which provide for consideration of the observations of non-medical sources regarding the effects of the claimant's impairments on his ability to work.  *Id., citing* 20 C.F.R. § 404.1513(e)(2).[9]  *See also Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).  When a claimant alleges symptoms that are not supported by medical evidence in the record, the agency directs the adjudicator to obtain information about those symptoms from third parties likely to have such knowledge.  SSR 88-13.  The ALJ must give "full consideration" to such testimony.  Id.

The relatives' reports, all reasonably consistent, are key to understanding the nature of Plaintiff's disability claim.  Focusing solely on evidence that demonstrated Plaintiff's physical and intellectual abilities and limitations, the ALJ lost sight of the principal reason Plaintiff became unable to work and was discharged from his job: chronic sleepiness and fatigue; loss of interest in nearly all aspects of life, including activities that Plaintiff formerly enjoyed; and sudden withdrawal from family members and friends.  By ignoring the relatives' reports, the ALJ failed even to address the symptoms that allegedly give rise to Plaintiff's disabilities.

### 2.    Plaintiff's Credibility

Plaintiff next challenges the ALJ's finding that Plaintiff's testimony was not credible.  The Commissioner counters that an ALJ cannot grant disability benefits based on a claimant's own testimony.  The Commissioner's response begs the question.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement.  *Orn*, 495 F.3d at 635, *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.

---

[9]  The relevant section is now designated 20 C.F.R. § 1513 (d)(4).

1   1989).  But if he or she decides to reject a claimant's testimony after a medical impairment has

2   been established, the ALJ must make specific findings assessing the credibility of the claimant's

3   subjective complaints.  *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738

4   (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence

5   undermines the claimant's complaints."  *Lester*, 81 F.3d at 834, *quoting Varney*, 846 F.2d at 584.

6   *See also Robbins*, 466 F.3d at 885.  The credibility findings must be "sufficiently specific to

7   permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."

8   *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

9          When weighing a claimant's credibility, the ALJ may consider the claimant's reputation

10   for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct,

11   claimant's daily activities, claimant's work record, and testimony from physicians and third

12   parties about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social*

13   *Security Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary

14   techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent

15   statements concerning the symptoms, and other testimony by the claimant that appears less than

16   candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a

17   prescribed course of treatment; and (3) the claimant's daily activities."  *Tommasetti v. Astrue*, 533

18   F.3d 1035, 1039 (9th Cir. 2008), *citing Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the

19   ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her

20   decision.  *Thomas*, 278 F.3d at 959.

21          The Ninth Circuit has summarized the applicable standard:

22          [T]o discredit a claimant's testimony when a medical impairment has been
            established, the ALJ must provide "'specific cogent reasons for the disbelief.'"
23          *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834).
            The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive."  *Id.*
24          Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a
            malingerer, those "reasons for rejecting the claimant's testimony must be clear and
25          convincing."  *Id.*  Social Security Administration rulings specify the proper bases
            for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's
26          testimony cannot be supported by reasons that do not comport with the agency's
            rules.  *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have
27          the same force and effect as the statute or regulations, they are binding on all
            components of the Social Security Administration, . . . and are to be relied upon as
28          precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th

                                                  21

Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

With regard to Plaintiff's credibility, the hearing decision states only, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." AR 17. This boilerplate language, used in nearly every hearing decision rejecting a claimant's request for benefits, falls far short of the standard required to reject a claimant's testimony as lacking credibility. When an ALJ does not find that the plaintiff was malingering, he or she must provide set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. The ALJ did not do so here.

### 3.    ALJ's Rejection of Modi's Opinion

Plaintiff contends that the ALJ erred in rejecting the opinions of his treating physician, Dr. Priti Modi. The Commissioner responds that the ALJ properly provided clear and convincing reasons for his rejection of Modi's opinion.

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight that the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician. *Id.* The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians. 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631. A
///

treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague*, 812 F.2d at 1230.

Nonetheless, an ALJ may disregard the opinion of a treating physician even if it is uncontradicted. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). But if he or she chooses to do so, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence in the record. *Lester*, 81 F.3d at 830-31. An ALJ can meet this requirement by setting forth a detailed and thorough factual summary, including all conflicting testimony; then articulating his or her interpretation of this evidence; and finally, setting forth his or her findings. *Magallanes*, 881 F.2d at 751. The ALJ cannot merely set forth conclusions; he or she must provide his or her own interpretation and explain why it, rather than the doctors' interpretations, are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988). The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion. 28 C.F.R. § 404.1527(d).

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work. *See Reddick*, 157 F.3d at 725. Although an ALJ is not bound by opinions rendered by Plaintiff's physicians regarding the ultimate issue of disability, he or she cannot reject them out of hand, but must set forth clear and convincing reasons for rejecting them. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993). A general statement that objective factors or the record as a whole are insufficient: the ALJ must tie the objective factors or the record as a whole to the opinions and findings that he or she rejects. *Embrey*, 849 F.2d at 422.

The ALJ here provided a laundry list of his reasons for rejecting Modi's opinions:

First, the analysis of Plaintiff's non-severe physical impairment, supra, is incorporated by reference herein. Second, on July 24, 2006, Tamara L. Elkins, Ph.D., reported that the claimant was active most of the day. The claimant said "he is getting his rhythm back." Third, on May 17, 2007, Dr. von Bolschwing diagnosed . . . the claimant with dysthymia with none to mild impairment. Fourth,

on May 23, 2007, Dr. Hernandez reported that the claimant would be able to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk up to six hours in an eight hour workday with normal breaks; and sit for six hours in a normal workday with normal breaks.  _Fifth_, the objective medical evidence does not show pathology reasonably likely to cause the debilitating symptoms alleged.  _Sixth_, the claimant has not undergone any intensive pain regimen or therapy which would have precluded him from performing activities at the above exertional level on a sustained basis for a period of 12 or more months.  _Seventh_, the claimant is not currently receiving any psychiatric care, only psychotropic medication from his family physician.  _Eighth_, the claimant's treatment has been routine or conservative in nature.  _Ninth_, there is no twelve-month period where the claimant's limitations provided disability.  _Tenth_, although the claimant says he has sleep apnea, he testified to sleeping 20 out of 24 hours.  _Eleventh_, the claimant is not taking medications of a type and dosage consistent with his allegations.  _Twelfth_, the record does not indicate that the claimant suffers from debilitating side effects from his medication.  _Thirteenth_, the claimant's allegations of pain and limitations are excessive and not consistent with treatment and medical findings.  _Fourteenth_, the claimant was able to participate in the administrative hearing and respond to the questioning without any apparent difficulties.  _Fifteenth_, concerning the activities of daily living, the claimant has described daily activities which are not limited to the extent one would expect, give the complaints of disabling symptoms and limitations.

AR 17-18 (_citations to hearing exhibits omitted_).

Items five through fifteen are just the type of unsupported conclusory statements of which the Ninth Circuit disapproved in _Embrey_.  In addition, with regard to item 14, an ALJ may not accept or reject a claimant's complaints solely on the basis of personal observation.  _Orn_, 495 F.3d at 639.  Personal observation is relevant only as part of an overall analysis of a claimant's credibility.  _Id._

Although more specific, items 2, 3, and 4 still represent incomplete and misleading analysis.  (Item one includes the same statements as items 2, 3, and 4.)  While it is true that, on July 24, 2006, Elkins reported that the claimant was active most of the day and reported that "he [wa]s getting his rhythm back," it is also true that, on December 28, 2007, she reported that Plaintiff was depressed, unmotivated and likely to fall asleep suddenly, sometimes in mid-conversation.  Elkins described Plaintiff as having descended into a vicious cycle of depression and physical illness that were combining to destroy Plaintiff's ability to function.  The ALJ did not acknowledge Elkins' reports of Plaintiff's decline, much less explain why he chose to favor the earlier medical report.

///

24

1    von Bolschwing performed intelligence testing but administered no measures of

2    depression.  The report does not articulate how she identified and evaluated Plaintiff's symptoms

3    to reach her diagnosis.  Nothing in her report suggest that she ever considered Plaintiff's

4    debilitating chronic fatigue.  Hernandez similarly assessed Plaintiff's physical abilities without

5    acknowledging Plaintiff's chronic fatigue.  Yet the record as a whole unequivocally indicates that

6    the fatigue was the key factor in Plaintiff's inability to perform his prior work driving a forklift or

7    to secure other employment.

8        The breadth of Modi's opinions as well as the absence of support for certain opinions raise

9    questions relating to supportability, consistency, and specialization.  Dismissing Modi's opinions

10   out of hand, the ALJ never articulated a reasoned basis for the wholesale rejection of the report of

11   Plaintiff's treating physician.

12       Because substantial evidence did not support the hearing decision and because the ALJ

13   failed to thoughtfully analyze Modi's opinions in the context of the record as a whole, reversal is

14   necessary.

15       **B.**     **Improper Application of the Medical-Vocational Guidelines (the "Grids")**

16       Plaintiff contends that, because he had reached the age of 50 by the date of decision, the

17   ALJ improperly applied the Grids by considering Plaintiff to be a younger individual, aged 18-49.

18   Defendant responds that, since Plaintiff had non-exertional limitations, the Grids did not apply in

19   his case.  Although the Court agrees that the Grids are not applicable in light of Plaintiff's non-

20   exertional limitations, it does not matter.  Applying the Grids as Plaintiff requests and assuming

21   his age to be fifty rather than forty-nine still leads to the conclusion that Plaintiff was not disabled.

22       The Grids are based on a maximum sustained work capability (RFC) which does not

23   substantially exceed that needed to perform work existing at the level of exertion specified for the

24   particular table (e.g., sedentary, light, medium).  Social Security Ruling 83-11.  The RFC for each

25   table reflects the absence of any non-exertional limitation.  *Id.*  Although depression and

26   conversion disorders may limit exertion, mental impairments are generally considered to be non-

27   exertional.  SSR 85-15.

28   ///

When a claimant has both exertional and non-exertional impairments, as Plaintiff did here, the ALJ must first determine whether the claimant is disabled by strength limitations alone.  SSR 83-14.  Here, the ALJ determined that Plaintiff's residual functional capacity, considered by strength alone, limited him to light work.  AR 19.  Whether evaluated as a fifty-year-old (closely approaching advanced age) or as forty-nine-year-old, a claimant limited to light work would be found not to be disabled using the grids.  20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 202.10, 202.17.

C.      **Additional Evidence Submitted to Appeals Council**

Plaintiff contends that the Commissioner erred in failing to consider a new sleep study and new opinions provided by Modi that were submitted to the Appeals Council following the ALJ's unfavorable decision.  The Commissioner responds that the additional evidence should be disregarded as irrelevant to the period under review.  The Court agrees with the Commissioner.

> In reviewing decisions based on an application for benefits, the Appeals Council will consider the evidence in the administrative law judge hearing record and any new and material evidence only if it relates to the period on or before the date of the administrative law judge hearing decision.  If you submit evidence which does not relate to the period on or before the date of the administrative law judge hearing decision, the Appeals Council will return the additional evidence to you with an explanation as to why it did not accept the additional evidence and will advise you of your right to file a new application.

20 C.F.R. § 416.1476(b)(1).

The date of the ALJ's hearing decision is December 24, 2008.  AR 20.  The updated sleep study is dated February 16, 2009 (AR 266), and Modi's new opinion is dated April 22, 2009 (AR 279).  The Appeals Council properly disregarded this additional evidence.

D.      **Obesity**

Plaintiff next contends that the ALJ erred in failing to consider his obesity, either alone or in combination with his other impairments.  The Commissioner responds that Plaintiff never provided medical evidence from which the ALJ could have concluded that his obesity resulted in an impairment.

Obesity was removed from the listing of impairments in 1999.  Thereafter, obesity may still enter into a multiple impairment analysis, but "only by dint of its impact upon the claimant's musculoskeletal, respiratory, or cardiovascular system."  *Celay v. Halter*, 332 F.3d 1177, 1181 n.

1   1 (9th Cir. 2003).  An ALJ need only include obesity in a multiple impairment analysis if it is

2   "clear from the record that [the plaintiff's] obesity . . . could exacerbate [his] reported illnesses."

3   *Id.* at 1182.  The multiple impairment analysis need not include obesity if the record is silent

4   regarding (1) whether and how the claimant's obesity might have exacerbated his other medical

5   conditions and (2) whether and how the claimant's obesity negatively affected his ability to work.

6   *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005).

7        A claimant must present evidence that reasonably alerts the ALJ that his or her obesity

8   exacerbates her other symptoms.  *Edwards-Alexander v. Astrue*, 336 Fed.Appx. 634, 637 (9th Cir.

9   2009).  "The fact that obesity is a risk factor for other impairments does not mean that individuals

10  with obesity necessarily have any of these impairments."  SSR 02-01p.

11       Even when an individual is morbidly obese, and his or her obesity affects his or her other

12  impairments, he or she may still be able to perform basic work activities despite his or her

13  impairments alone or in combination.  *Papen v. Comm'r of Social Security Admin.*, 349

14  Fed.Appx. 205, 207 (9th Cir. 2009).  When the claimant failed to set forth evidence establishing

15  that his obesity combined with other impairments increased the severity of his limitations, the

16  ALJ did not err in failing to consider it.  *Hoffman v. Astrue*, 266 Fed.Appx. 623, 625 (9th Cir.

17  2008).  To require an ALJ to address obesity when the claimant did not raise the issue before him

18  would eviscerate the claimant's burden of proving a medically determined impairment.  *Bowser v.*

19  *Commissioner of Social Security*, 121 Fed.Appx. 231, 236-37 (9th Cir. 2005).  In the absence of

20  sufficient evidence, the ALJ may not make assumptions about the severity of a claimant's obesity

21  or its effect on other impairments.  SSR 02-01p.  *See also Burch*, 400 F.3d at 683 (finding that the

22  plaintiff's obesity did not significantly limit her ability to perform work).

23       Although represented by counsel, Plaintiff never raised the obesity issue below.  Nothing

24  in the record identifies Plaintiff's obesity as creating a functional limitation that prevents Plaintiff

25  for engaging in any activity.  Although the medical notes of various physicians recorded

26  Plaintiff's weight and sometimes identified him as obese, no physician opined that Plaintiff's

27  obesity created or exacerbated any functional limitation.  No physician determined Plaintiff's BMI

28  or treated Plaintiff for weight loss beyond encouraging him generally to get some exercise or lose

some weight.  Modi's opinion did not include obesity among the conditions that Modi believed severely impaired Plaintiff.  *Contrast this case with Glass v. Barnhart*, 163 Fed.Appx. 470, 472 (9th Cir. 2006) (expert witness testified that the claimants functional capacity was limited by the combination of morbid obesity (450 pounds) and knee problems).

The ALJ did not err in failing to address Plaintiff's obesity.

**E.     Borderline Intellectual Functioning**

For the first time, Plaintiff contends that in light of his other impairments, the ALJ erred in failing to consider whether Plaintiff's borderline intellectual functioning equaled the requirements of 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (mental retardation).  When a plaintiff has failed to bear his or her burden of demonstrating a disability under § 12.05, protests the Commissioner, the Commissioner cannot be required to demonstrate why he failed to consider every possibly applicable listing.

Plaintiff concedes that he does not meet the listing criteria.  First, his functional deficits are not development disabilities.  Section 12.05 provides:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

In this case, Plaintiff functioned well into his forties, successfully performing a responsible and well-paid position that the vocational expert categorized as semi-skilled.  Modi opined that Plaintiff's emotional problems resulted in an approximate fifteen-point drop in his intelligence quotient.  Thus, even if his borderline intelligence somehow contributed to Plaintiff's impaired functioning, it cannot be the listing in section 12.05 since it did not arise before age 22.

Similarly, Plaintiff borderline intelligence scores do not satisfy the significantly sub-average scores required to satisfy the listing.  In von Bolschwing's testing, Plaintiff's IQ scores ranged from 76 to 79.  To satisfy the listing requirements, a claimant must either (1) have a valid verbal, performance or full IQ of 59 or less; (2) have a valid verbal, performance or full IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitations of function; or (3) have a valid verbal, performance or full IQ of 60 through 70

and at least two of the following: (a) marked restrictions in activities of daily living; (b) marked difficulties in maintaining social functioning; (c) marked difficulties in maintaining concentration, persistence or pace; or (d) repeated episodes of decompensation, each of extended duration.

As was the case with his obesity claim above, Plaintiff, not having raised this argument before the ALJ, now contends that the ALJ should have somehow imagined that the listing could be sufficiently contorted to find Plaintiff disabled.  As with regard to Plaintiff's contentions regarding obesity, to require an ALJ to address an issue that the claimant did not raise before him would eviscerate the claimant's burden of proving a medically determined impairment.  *Bowser*, 121 Fed.Appx. at 236-37.

### F.     Specificity of Hypothetical Questions

Plaintiff contends that the ALJ's hypothetical questions included vague and unquantifiable limitations--specifically the phrases "slightly limited in the ability to do SRT," "pain slight to moderate," and "occasional supervision."  Therefore, says Plaintiff, this Court must reject those questions and consider only his attorney's hypothetical question, which incorporated the restrictions articulated in Modi's opinion.

Once the claimant has carried his or her burden of proving that he or she cannot return to his or her previous job, the burden shifts to the Commissioner to prove that the claimant can perform other work.  *Embrey*, 849 F.2d at 422.  The Commissioner must show that the claimant can perform other types of substantial gainful work that actually exist in the national economy.  *Magallanes*, 881 F.2d at 756. The Commissioner generally does so through the testimony of a vocational expert.  The hypothetical questions posed to the vocational expert must set forth all of the claimant's substantial, supported limitations and restrictions so that the vocational expert's opinion is supported by medical evidence.  *Id.*  If the record does not support the assumptions in the hypothetical question, the vocational expert's opinion has no value.  *Id.*

This Court has found that the hearing decision was not based on substantial evidence in the record as a whole and must be reversed.  Because analysis of the hypothetical questions used at the prior hearing are now moot, this decision does not further analyze the composition of the hypothetical questions posed to the vocational examiner at the prior hearing.

### G.     Consistency with the Dictionary of Occupational Titles (DOT)

Finally, Plaintiff contends that the ALJ erred in failing to ask the vocational expert whether his testimony was consistent with the DOT. *See* SSR-4p. Because the Court has determined that this case must be reversed and remanded, it need not address this issue.

### III.     Conclusion and Order

"The court shall have the power to enter, upon pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In social security cases, the decision to remand to the Commissioner to award benefits is within the court's discretion. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. Where, however, a rehearing would simply delay receipt of benefits, reversal and an award of benefits is appropriate." *Id.* (*citation omitted*).

The hearing decision failed to fully analyze all the evidence in the record below and to fully set forth the ALJ's findings, analysis, and conclusions. The evidence is extensive, complex, and inconsistent. Remand of this matter will permit the Commissioner to analyze the record as a whole and to set forth his decision in conformance with applicable law, as well as to secure such additional evidence as he may deem necessary.

Accordingly, this Court orders that the administrative determination be REMANDED for further proceedings in accordance with this decision and in conformity to applicable law. The Clerk of Court is hereby directed to ENTER JUDGMENT in favor of Plaintiff Ramon Guardado, Jr., and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

Dated:    **May 27, 2011**                        _____**/s/ Sandra M. Snyder**_____
                                                                   UNITED STATES MAGISTRATE JUDGE